UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/31/15

J.C. and J.F., individually and on behalf of
C.C.,

           Plaintiffs,

        -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION,

           Defendant.

**MEMORANDUM
OPINION & ORDER**

13 Civ. 3759 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiffs J.C. and J.F. bring this action against the New York City Department of

Education ("DOE") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20

U.S.C. § 1400 et seq. Plaintiffs seek to overturn a State Review Officer's decision finding that

the individualized education program the DOE recommended for Plaintiffs' son C.C. was

appropriate. The parties have filed cross-motions for summary judgment. For the reasons stated

below, Defendant's motion will be granted and Plaintiffs' motion will be denied.

## BACKGROUND

### I. STATUTORY FRAMEWORK

        "Under the IDEA, states receiving federal funds are required to provide 'all

children with disabilities' a 'free appropriate public education.'" Gagliardo v. Arlington Cent.

Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (quoting 20 U.S.C. § 1412(a)(1)(A)); see also

Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998). A "free appropriate

public education" ("FAPE") must include "'special education and related services' tailored to

meet the unique needs of a particular child, . . . and be 'reasonably calculated to enable the child

to receive educational benefits[]' . . . ." Walczak, 142 F.3d at 122 (citations omitted) (quoting 20 U.S.C. § 1401(9); Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982)).

Special education and related services under the IDEA are provided by a school district pursuant to an annual individualized education program or "IEP." Walczak, 142 F.3d at 122; see also 20 U.S.C. § 1414(d). In New York, local committees on special education ("CSE") are responsible for developing appropriate IEPs. Walczak, 142 F.3d at 123. "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." Gagliardo, 489 F.3d at 107-08 (citing N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 8, § 200.1(ww)(3)(i)).

"If a New York parent 'believe[s] an IEP is insufficient under the IDEA,' he or she 'may challenge it in an impartial due process hearing . . . before an [Impartial Hearing Officer, or "IHO"] appointed by the local board of education.'" M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 224 (2d Cir. 2012) (alterations in M.H.) (citation omitted) (quoting 20 U.S.C. § 1415(f); Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003) (internal quotation marks and citation omitted) (citing N.Y. Educ. Law § 4404(1))). "An IHO's decision may, in turn, be appealed to a State Review Officer ('SRO'), who is an officer of the State's Department of Education." Id. (citing Grim, 346 F.3d at 379-80) (footnote omitted). "Generally, [a] 'party aggrieved' by the findings of the SRO '[has] the right to bring a civil action' in either state or federal court." Id. (quoting 20 U.S.C. § 1415(i)(2)(A)).

Parents pursuing an administrative challenge "may, at their own financial risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state." Gagliardo, 489 F.3d at 111 (citing Sch. Comm. of Burlington, Mass. v.

2

Dep't of Educ. of Mass., 471 U.S. 359, 370 (1985)).  Such reimbursement covers "'expenses that [the school district] should have paid all along.'"  T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009) (per curiam) (quoting Burlington, 471 U.S. at 370-71).

Courts considering a reimbursement request for the cost of private school tuition must consider (1) whether the "school district fail[ed] to provide a FAPE"; (2) whether "the private [school] placement was suitable"; and (3) whether the "equities" warrant a reimbursement award in full or in part.  Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 247 (2009); see also Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 363-64 (2d Cir. 2006).

## II.   FACTS

### A.   C.C.'s Background

In June 2011, C.C. was a 12-year-old boy who had been diagnosed with autism and classified as a student with a speech and language impairment.  (Plaintiffs' Local Rule 56.1 Statement ("Pltf. R. 56.1 Stmt.") (Dkt. No. 31) ¶ 1; Pltf. Ex. A (Dkt. No. 17) at 1)[1]  He has deficits in his communication, sensory, and fine motor skills, and has social and academic difficulties due to problems with relatedness and social learning.  (Impartial Hearing Transcript ("Tr.") (Dkt. No. 17) at 196, 256-57, 583, 600)

For the school years 2006-07 through 2010-11, C.C. attended the Rebecca School, a private special education school.  (Tr. 160, 264)  Plaintiffs rejected IEPs for the 2008-09, 2009-

---

[1] To the extent that this Court relies on facts drawn from the parties' Local Rule 56.1 statements, it does so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) (citations omitted) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

3

10, and 2010-11 school years and obtained tuition reimbursement from the DOE for C.C.'s education at the Rebecca School during these years. [2] See Tr. 5-10.

Believing that the Rebecca School would not adequately address C.C.'s future educational needs, Plaintiffs sought a new school placement for the 2011-12 school year. C.C.'s parents sought a "more challenging" learning environment for C.C., with "stronger peers" and "more direct academic instruction." (Tr. 213-14, 801-02)

In January 2011, Plaintiffs entered into an enrollment contract with the Forum School – a private special education school located in Waldwick, New Jersey – for the 2011-12 school year. (Pltf. Ex. S (Dkt. No. 17); Pltf. Ex. U (Dkt. No. 17) at 1-2; Tr. 802-803) At that time, Plaintiffs provided a one-month tuition deposit of $4,463 to the Forum School, securing C.C.'s place at the school for the 2011-12 school year. (Pltf. Ex. U (Dkt. No. 17) at 2; Tr. 802-03)

---

[2] On January 23, 2009, an IHO found that the DOE had not provided C.C. with a FAPE for the 2008-09 school year, and that the educational program at the Rebecca School was appropriate for him. (Pltf. Ex. C (Dkt. No. 17) at 8-9) The IHO awarded Plaintiffs tuition reimbursement for C.C.'s education at the Rebecca School for that year, and directed the DOE to provide additional out-of-school related services for C.C. (Id. at 8-9, 11-14) That decision was not appealed. See Tr. 5. Plaintiffs filed a due process complaint for the 2009-10 school year seeking tuition reimbursement, and that claim was settled. See Tr. 10. Plaintiffs also filed a due process complaint concerning the IEP formulated for the 2010-11 school year. See Pltf. Ex. D (Dkt. No. 17) at 12. On July 7, 2011, an IHO found that the DOE had not provided C.C. with a FAPE for the 2010-11 school year, and that the educational program at the Rebecca School was appropriate for him. (Pltf. Ex. D (Dkt. No. 17) at 16, 18-19) The IHO ordered the DOE to reimburse Plaintiffs for tuition at the Rebecca School for the ten-month school year in 2010-11, less payments already made by the DOE pursuant to an order of pendency. (Id. at 18-19) The DOE appealed that decision to an SRO. On September 16, 2011, the SRO dismissed the DOE's appeal on mootness grounds, finding that – separate and apart from issues regarding the IEP for the 2010-11 school year – the DOE was obligated to make the tuition payments as a result of the pendency order. (Pltf. Ex. E. (Dkt. No. 17) at 5-10)

4

**B.     The CSE's IEP**

On March 2, 2011, the DOE convened a CSE meeting for the purpose of

developing an IEP for C.C. for the 2011-12 school year. (Pltf. R. 56.1 Stmt. (Dkt. No. 31) ¶ 16)

Attendees at the meeting included C.C.'s mother; Marguerite Cohen, C.C.'s teacher at the

Rebecca School; and Rose Fochetta, a DOE psychologist. (Def. Ex. 8 (Dkt. No. 17);

Defendant's Local Rule 56.1 Statement ("Def. R. 56.1 Stmt.") (Dkt. No. 37) ¶¶ 4-6)

At the meeting, all agreed that a twelve-month school year would be appropriate

for C.C., in order to avoid "the likelihood of regression over the summertime." (Tr. 205, 256-57;

Def. Ex. 7 (Dkt. No. 17) at 15) The attendees also discussed the appropriate class size for C.C.,

and considered student-teacher-paraprofessional ratios of 12:1:1, 8:1:1, and 6:1:1. (Tr. 205-06)

The CSE concluded that the 12:1:1 and 8:1:1 ratios would be "too large . . . to meet [C.C.'s

educational] needs."[3] (Tr. 205-06; Def. Ex. 7 (Dkt. No. 17) at 15) C.C.'s mother expressed

concern, however, that placement in a 6:1:1 classroom would mean that C.C. would be grouped

with lower functioning children. C.C.'s mother requested that C.C. be placed with higher

functioning peers. (Pltf. R. 56.1 Stmt. (Dkt. No. 31) ¶¶ 19-20; Def. R. 56.1 Stmt. (Dkt. No. 37)

¶ 7; Def. Ex. 4 (Dkt. No. 17); Tr. 241-42)

At the conclusion of the March 2, 2011 CSE meeting, the CSE provided C.C.'s

mother with a "Notice of Recommended Deferred Placement:  Annual Review or Reevaluation."

(Tr, 219-20; Def Ex. 5 (Dkt. No. 17)) The notice states that, "[a]s a result of the [CSE] meeting,

the IEP Team" recommends that C.C. attend a "special class in [a] specialized school district,"

---

[3] With respect to class size, the IEP states: "A special class in a specialized school with both
student to teacher ratios of 12:1:1 and 8:1:1 [was] considered and rejected as insufficiently
supportive.  The student to teacher ratios in these programs are too large for [C.C.] to be able to
achieve his IEP goals." (Def. Ex. 7 (Dkt. No. 17) at 15)

5

and that he receive speech services, physical and occupational therapy, and counseling services. (Id.) The notice advises C.C.'s mother that, "[a]lthough [C.C.] [has] the right to an immediate placement in this program, the IEP Team believes it may be in the best interest of the child to defer placement in this program until June 15th, 2011," because "this IEP is developed for [the] 2011-2012 school year." (Id.) The notice makes clear that deferring placement "means that your child will continue in his/her current educational placement." (Id.) The notice further directs C.C.'s mother to "contact[] Nancy Funke . . . for assistance in arranging an appointment" to "visit a sample of the type of program recommended for [C.C.]," and states that C.C.'s mother "will be receiving a Final Notice of Recommendation notifying [her] of a specific [placement] site, on or before June 15th, 2011." (Id.)

The notice states that "[i]f [C.C.'s mother] [does] not agree with the [CSE's] recommendation, [she] [has] the right to request mediation or an impartial hearing." (Id.) C.C.'s mother signed the notice and returned a copy to the DOE,[4] but she did not respond to a question asking whether she agreed or disagreed with the CSE's recommendation to defer placement in the proposed program until June 15, 2011. (Id.) C.C.'s mother did, however, check a box at the bottom of the notice stating, "I disagree with the Program Recommendation." (Id. (emphasis in original))

The IEP formulated at the March 2, 2011 CSE meeting states that C.C. will begin his education under the IEP on July 1, 2011. (Def. Ex. 7 (Dkt. No. 17) at 2) The IEP recommends that C.C. be placed in a twelve-month program in a 6:1:1 classroom, and that he receive speech services, physical and occupational therapy, and counseling. (Def. Ex. 7 (Dkt.

---

[4] The date on which C.C.'s mother signed the notice is not clear. The handwritten date appears to be either March 21, 2011, or May 21, 2011. (Id.; see also Tr. 903)

No. 17) at 1, 16) The IEP states that C.C.'s "[b]ehavior does not seriously interfere with instruction" and that it "[c]an be addressed by [the] special education teacher."[5] (Id. at 4) Accordingly, the IEP does not include a functional behavioral assessment ("FBA") or a behavioral intervention plan ("BIP").[6] (Tr. 192-93, 274-75; Def. Ex. 7 (Dkt. No. 17) at 4) The IEP likewise does not provide for parental training or counseling. See Def. Ex. 7 (Dkt. No. 17). It also does not provide a specific school placement site for C.C. See id. Additionally, although the IEP does not reflect C.C.'s parents' concern that he be functionally grouped with appropriate peers (see id.), a "District 75 Placement Office Referral Form" for C.C. conveys the parents' desire for a higher functioning placement. (Def. Ex. 4 (Dkt. No. 17) at 1 ("Parents indicated that in the past, they have been offered classes that are too low functioning. They are seeking a higher functioning placement."))

## C.   DOE Placement at P811M at P101M

On June 10, 2011, the DOE sent C.C.'s parents a Final Notice of Recommendation ("FNR") offering C.C. a 12-month, 6:1:1 special education placement at

---

[5] The IEP acknowledges that, "[w]hen in an over stimulated state, which happens less frequently, [C.C.] will jump hard, make a squealing noise[,] and try to wrestle with other people around him." (Def. Ex. 7 (Dkt. No. 17) at 4) The IEP provides strategies for managing this behavior, advising that when C.C. is in an "over stimulated state" he "requires firm and clear limits [about] keeping his hands on his own body. He benefits from co-regulation through modeling a calm state (deep breathing and using a calm voice)." (Id.)

[6] "Functional behavior assessment means the process of determining why the student engages in behaviors that impede learning and how the student's behavior relates to the environment." 8 NYCRR § 200.1(r).

"Behavioral intervention plan means a plan that is based on the results of a functional behavioral assessment and, at a minimum, includes a description of the problem behavior, global and specific hypotheses as to why the problem behavior occurs and intervention strategies that include positive behavioral supports and services to address the behavior." 8 NYCRR § 200.1(mmm).

"P811M [at] P101M" for the 2011-12 school year.[7]  (Def. R. 56.1 Stmt. (Dkt. No. 37) ¶ 19; Def. Ex. 3 (Dkt. No. 17))  The notice states that it constitutes "the final recommendation for the 2011-2012 school year," and that "[i]f the [DOE] [does] not hear from [C.C.'s parents] within 10 days of the date of th[e] letter, the recommended services will be put into effect," unless the parents "request another IEP [m]eeting, mediation, or impartial hearing, before this date . . . ."  (Def. Ex. 3 (Dkt. No. 17))

The Final Notice of Recommendation identifies C.C.'s placement for the 2011-12 school year as "P811M [at] P101M."  (Id.)  "P811M is a self-contained, specialized school with multiple locations."  (Def. R. 56.1 Stmt. (Dkt. No. 37) ¶ 21)  "P811M refers to the main site" (id.), which is located at 82nd Street and West End Avenue in Manhattan.  (Tr. 299)  The school site that the DOE recommended for C.C. – P811M at P101M – is an "offsite location" of P811M located on 111th Street between Lexington and Park Avenues in Manhattan.  (Def. R. 56.1 Stmt. (Dkt. No. 37) ¶ 21; Tr. 298-99)

P811M at P101M "was closed for the summer of 2011 due to construction," but P811M's main site, as well as P149 – another offsite location of P811M that is located at 118th Street and Lenox Avenue in Manhattan – "were open for the summer and educated all students assigned to [P811M at P101M] for the summer months."  (Def. R. 56.1 Stmt. (Dkt. No. 37) ¶ 22; Tr. 298-99)  The June 10, 2011 Final Notice of Recommendation sent to Plaintiffs does not disclose that P101M will be closed for the summer, nor does it state which summer re-location site C.C. is assigned to.  See Def. Ex. 3 (Dkt. No. 17).

---

[7]  Plaintiffs received the FNR on June 14, 2011.  (Def. R. 56.1 Stmt. (Dkt. No. 37) ¶ 20; Pltf. Ex. J (Dkt. No. 17) at 1; Tr. 868)

8

On June 16, 2011, C.C.'s mother faxed a letter to the Chairperson of the CSE, stating that she had "called [P101M] [that] morning and asked to set up a time to visit [C.C.'s] classroom." (Pltf. Ex. J (Dkt. No. 17) at 1)  She stated that she "spoke with Michael Santos, Transportation Coordinator [for P101M], who said that it is impossible for [her] to visit the proposed placement as the school is closed for the summer and there will be no students." (Id.) In her June 16, 2011 letter, C.C.'s mother further states:

> We are concerned that [C.C.] was not properly evaluated and assessed in preparation for the IEP development and, for a number of reasons, the program recommended and [the] proposed IEP are not appropriate for [C.C.]  He continues to require more intensive and specialized teacher support, as well as extended day services, to address his unique deficits.  In addition, although we requested special education transportation[,] it was not given to us on the IEP.

> Unless the DOE offers [C.C.] an appropriate placement and program, please be advised that [C.C.] will attend[] The Forum School in Waldwick, NJ for the 2011-2012 twelve[-]month school year, as a component of his/her educational program. [A number of] additional services will also continue to be provided for [C.C.] as they are appropriate for [C.C.'s] specific needs . . . .  For the 2011-2012 school year, this letter will serve as notice that I intend to provide these services and will seek to hold the [DOE] financially responsible for said services.

(Id.)

In a June 30, 2011 letter, Plaintiffs again reject the DOE's proposed placement. (Pltf. Ex. B. (Dkt. No. 17) at 1)  Plaintiffs demand a due process hearing and reiterate that C.C. will be "attending The Forum School . . . for the 2011-2012 school year." (Id. at 1; Def. R. 56.1 Stmt. (Dkt. No. 37) ¶ 39)  C.C. began his studies at the Forum School on July 5, 2011.  See Pltf. Ex. V (Dkt. No. 17).

## III.    ADMINISTRATIVE PROCEEDINGS

### A.    Plaintiffs' Due Process Complaint

Plaintiffs filed an amended due process complaint on July 11, 2011.  (Pltf. Ex. A (Dkt. No. 17))  Plaintiffs assert that the DOE has not provided C.C. with a FAPE for the 2011-12

school year, and they seek tuition reimbursement for C.C.'s education at the Forum School for

that year.  (Id. at 1)  Plaintiffs allege, inter alia, that

(1)  the proposed program in the March 2011 IEP "is not 'reasonably calculated' to provide [C.C.] with a FAPE";

(2)  the "DOE failed to timely develop and rely upon critical assessment reports that should have been used as the basis for establishing 'present levels' as part of the fundamental development of the IEP";

(3)  the "DOE failed to offer <u>any</u>, much less appropriate, special education transportation";

(4)  the "DOE's recommended school for the twelve-month 2011-2012 school year is not even open during the summer months";

(5)  "the recommended placement was not ready, willing and able to timely fulfill [C.C.'s] IEP service mandate by trained and properly supervised personnel";

(6)  the March 2011 IEP did not provide "for individualized parent counseling and training as a related service for students who have been diagnosed on the autism spectrum";

(7)  the "DOE failed to develop an appropriate Functional Behavior Assessment ("FBA") [or Behavioral Intervention Plan ("BIP")], despite [C.C.'s] interfering behaviors";

(8)  "the proposed IEP lacks goals and objectives to address and remediate [C.C.'s] [interfering] behaviors";

(9)  the "DOE failed to appropriately communicate with [C.C.'s] teachers and related service providers as part of developing [his] program and placement";

(10)  the "DOE engaged in impermissible 'predetermination' in the IEP development process, precluding any meaningful participation from [C.C.'s] parents and/or other team members";

(11)  the IEP does not include appropriate goals or methods of measuring C.C.'s goals;

(12)  the "DOE failed to offer adequate levels and frequencies of related services";

(13)  the "DOE failed to adequately consider [C.C.'s] need for consistency in his program given his transition and generalization deficits – <u>no transition plan</u>, appropriate or otherwise, was discussed, recommended or developed by the DOE;

(14)  the "DOE failed to meaningfully include [C.C.'s] parents in the IEP development and placement selection process";

(15)     the "DOE's proposed IEP for 2011-2012 is sufficiently similar to its previous IEP
         that was already adjudicated as failing to provide a FAPE";

(16)     the "DOE failed to discuss, develop, recommend or offer a specific placement
         location at [C.C.'s] IEP meeting";

(17)     the "DOE's recommended placement is not ready, willing and able to deliver
         related services";

(18)     the "students in the proposed classroom are grouped primarily by age and not by
         functioning level and/or their classifications"; and

(19)     the "DOE failed to timely offer a placement recommendation – appropriate or
         otherwise – for [C.C.]."

(Pltf. Ex. A (Dkt. No 17) at 1-8)  Plaintiffs also contend that C.C.'s services at the Forum School

are "'reasonably calculated' to provide meaningful educational benefits to [C.C.], and thus are

reimbursable . . . ." (Id. at 8)

### B.     The Impartial Hearing

The impartial hearing began on September 7, 2011, and concluded on April 19,

2012, after eight days of hearings.  The DOE offered testimony from (1) Rose Fochetta, a school

psychologist who was a member of the CSE that formulated C.C.'s IEP (Tr. 157-290);

(2) Michael Santos, the Transportation Coordinator at P811M at P101M (Tr. 297-316); and (3)

Bonnie Segal, a special education teacher in a 6:1:1 classroom at P811M.  (Tr. 317-377, 931-92)

Fochetta – who had helped develop C.C.'s IEPs for 2008 and 2009 (Tr. 160) –

testified about the March 2, 2011 CSE meeting at which C.C.'s IEP for the 2011-12 school year

was formulated.  She stated that the CSE reviewed a number of documents at that meeting,

including records from the Rebecca School and a psychodiagnostic evaluation submitted by

C.C.'s parents.  The CSE also discussed C.C.'s academic management needs, and his social and

emotional state.  (Tr. 160-65, 176-91)  Fochetta testified that, in preparing C.C.'s IEP, the CSE

11

"focused . . . on the [8:1:1] versus [6:1:1] [classroom setup]," and that "[C.C.'s] parents were more concerned about [C.C.'s] peer grouping than the actual ratio." (Tr. 206)

C.C.'s parents told Fochetta that the DOE "had suggested classes for [C.C.] [in the past] that [the parents] felt were too low[-]functioning." (Tr. 206)  At the CSE meeting, Fochetta "let [the parents] know that [she] would do [her] best to let . . . the placement officer [know] . . . [about] that concern." (Tr. 206-07)  Fochetta also testified that, after the CSE meeting, she filled out a "District 75 placement form" for Nancy Funke – a DOE placement officer – and "made a note at the bottom about the functional grouping." (Tr. 210-11; Def. Ex. 4 (Dkt. No. 17))

Fochetta testified that the CSE ultimately determined that a 6:1:1 12-month placement for C.C. was appropriate.  (Tr. 205-08)  A 12-month program was selected because of C.C.'s significant delays cognitively, academically, and socially, and in order to "avoid regression over the summer." (Tr. 256-57)  Fochetta testified that "overall, [she] agree[d] with the program that was recommended for [C.C.] by the DOE for the [2011-12] school year," because C.C. "needs a very supportive environment" – including "a small student/teachers ratio." (Tr. 214-15)  Fochetta believes that C.C.'s "impairments . . . can be addressed in a [6:1:1] class," but she acknowledges that there is a "huge variation" among the 6:1:1 programs offered at various schools in C.C.'s school district.  (Tr. 245, 266)  Fochetta noted that the CSE team "wrote the IEP listening to every member of the meeting, and taking their perspective[s] into consideration." (Tr. 214-15)

Santos testified that he has been the Transportation Coordinator for P811M at P101M for "about ten years," that he is not responsible for summer school, and that he had no "involvement in transportation [for P811M at P101M] during the summer of 2011." (Tr. 297-99)

Santos was aware, however, that summer school for P811M at P101M is held at the school's main site at West 82nd Street and West End Avenue and at P149, located at 118th Street and Lenox Avenue. (Tr. 299) Santos further testified that he sometimes speaks with parents about coordinating transportation and about visiting P101M, although he has no recollection of speaking with C.C.'s parents. (Tr. 299-300) Santos did recall that during June 2011 parents called about visiting the school over the summer. (Tr. 301, 307) Santos testified that he "informed [the callers] that [the] site is closed for the summer due to construction, but [that] all kids are sent to either the main site [for P811M] or to [P]149 for summer school." (Tr. 302, 306-07) He testified that he never told any caller "that the site was closed and there was no school for the[ir] children to go to." (Tr. 302, 306) Santos also pointed out that if C.C.'s mother had called on June 16, 2011 and asked to visit P101M, P101M would have been open at that time, because the school year had not yet ended. (Tr. 306)

Segal – a special education teacher at P811M – testified that during the summer of 2011 P101M operated at the P811M main site – West 82nd Street and West End Avenue in Manhattan. (Tr. 318-19) Segal had five students in her 6:1:1 class on the first day of summer school in July 2011. (Tr. 320, 324) Although C.C. was on her attendance register for that summer, he never attended her class. (Tr. 345) Segal testified that – based on the information in C.C.'s IEP – "he would have fit into the classroom very nicely," because the other children in her class were functionally at essentially the same level. (Tr. 346) The students were 12 to 13 years old and were generally reading at a 3rd or 4th grade level, although one student was "non-verbal [and] was using mostly communication symbols."[8] (Tr. 325-28, 334-35, 942-44) On direct

---

[8] C.C. was 12 years old at this time and was reading at a second-grade level. See Pltf. Ex. A (Dkt. No. 17) at 1; Tr. 419-20.

13

examination, Segal testified that she spent about six to seven hours of one-on-one time per week with each of the five students. (Tr. 332) On cross-examination, however, Segal admitted that she taught for only about five hours per day, and 25 hours per week. (Tr. 965-67) Segal also testified that she does not know whether any DOE employee was assigned to "inform incoming students or new students about the summer main site issue" concerning P101M. (Tr. 937)

Plaintiffs offered testimony from (1) Stacey Minondo, the DOE's Director of Placement for District 75 (Tr. 412-509); (2) Meryl Segal, a social worker at the Forum School (Tr. 526-76); (3) Kenneth Edwards, C.C.'s teacher at the Forum School (Tr. 576-629); (4) Francine Reinitz, the Forum School's speech therapist (Tr. 629-50); (5) Nicole Kolenda, a speech and language pathologist who has worked with C.C. since 2009 (Tr. 660-702); (6) Amanda Friedman, one of C.C.'s home-based therapists (Tr. 703-65); (7) Melissa Frey, C.C.'s home-based occupational therapist (Tr. 765-93); and (8) C.C.'s mother. (Tr. 797-919)

Minondo is responsible for placement for District 75 schools, and she testified about the "class profile" that was generated for C.C.'s class at P811M. (Tr. 416-25; Pltf. Ex. LL (Dkt. No. 17)) The class profile shows five children attending the class. (Pltf. Ex. LL (Dkt. No. 17)) Three of these students have "non-testable" reading and math levels; one student has a math level between first and second grade, and a reading level between second and third grade; and the fifth student is characterized as "AA."[9] (Id.; see also Tr. 420-23) Minondo testified that "non-testable means that the person [who] did the assessment was not able to get any testing results." (Tr. 423-34) The class profile also indicates that a sixth student is "[a]waiting [a]uthorization." (Pltf. Ex. LL (Dkt. No. 17)) Minondo testified that this is a reference to C.C.,

---

[9] Neither Minondo nor the parties have an understanding as to what level "AA" represents. See Def. R. 56.1 Stmt. (Dkt. No. 37) ¶ 33); Tr. 422.

14

and that the class profile indicates that C.C. functions at a second-grade level in math and

reading. (Tr. 418-19)

Minondo also testified about the summer closures of DOE schools, and how the

DOE generally informs parents about summer relocation sites. Although Minondo did not recall

whether P101M was open during the summer of 2011, she testified that

> [t]ypically when we are offering a student a placement for the school year and we
> know that particular site is closed for that summer, but we still believe that the
> recommendation and the site that is offered . . . would be good [for the student]
> when the school [reopens] in September, . . . we would usually send out [one]
> [Final Notice of Recommendation] for the summer [informing the parents about]
> where [the] summer placement is, and then another [Final Notice of
> Recommendation] [informing the parents about] where [the] September
> placement is . . . . Or we would advise the placement officer . . . [to] inform the
> family that [during the] summer, July and August, [the] [placement] site will be
> the main site[,] or wherever it may be.

(Tr. 427-29)

Minondo testified that the June 10, 2011 Final Notice of Recommendation sent to

Plaintiffs was likely an "offer . . . for the [2010-11] school year," because she "[did] not have a[]

[Final Notice of Recommendation] in front of [her] that shows there was a different offer for the

summer." (Tr. 429) After the IHO gave Minondo an opportunity to search her files on the DOE

computer system, Minondo testified that (1) she found the June 10, 2011 Final Notice of

Recommendation showing C.C.'s placement at P811M at P101M, but (2) she could not find a

document "showing that [the DOE] gave the family a July and August school [relocation]

[placement][.]" (Tr. 476-81) Minondo stated that she had not "exhausted the search,

[however]." (Tr. 479)

C.C.'s mother testified that, at the March 2011 CSE meeting, she informed the

CSE that she wanted "a less restrictive placement [for C.C.], similar [to the 8:1:3] class size

[that] he was doing well in [at the Rebecca School], and stronger peer[s]." (Tr. 805) She stated

15

that no one from the DOE had explained why a 6:1:1 program was more appropriate, and that she had never seen a 6:1:1 classroom that "had the kind of children that [she] believe[d] would offer [C.C.] the higher functioning models that . . . [she] thought he needed." (Tr. 807, 908) C.C.'s mother testified that "[e]verybody agreed" at the March 2011 CSE meeting that C.C. "had made enough progress to be considered for a higher functioning situation[.]" (Tr. 913) She further testified that C.C. had become higher functioning at the Forum School, and that he has made progress because of his placement in a class of higher-functioning children. (Tr. 912-13)

C.C.'s mother also testified that she received a Final Notice of Recommendation on or about June 15, 2011, which offered C.C. a 6:1:1 placement at P811M at P101M. (Tr. 813) She called P101M and spoke to Santos, who said it was "not possible" for her to look at the school because it was "closed for the summer." (Tr. 813-14) C.C.'s mother faxed a letter the next day to the CSE chairperson, stating that "the placement [the CSE] had given [to C.C.] was closed for the summer and that [C.C.'s parents] were looking for another placement for the summer." (Tr. 814-15; see also Pltf. Ex. J (Dkt. No. 17)) C.C.'s mother stated that her fax was successfully transmitted,[10] but that she never received a response from the DOE regarding C.C.'s summer placement. (Tr. 815-16) In the letter, C.C.'s mother stated that unless she received an appropriate placement she would be sending C.C. to the Forum School. (Tr. 815)

Plaintiffs' remaining witnesses – Meryl Segal, Edwards, Friedman, Reinitz, Kolenda, and Frey – testified about the services that C.C. receives at the Forum School and at home, and the progress that he is making. See Tr. 526-793.

---

[10] The IHO noted that the parents had submitted a fax confirmation sheet at the hearing. (IHO Decision (Dkt. No. 21) at 24-25; see also Pltf. Ex. J (Dkt. No. 17) at 2)

16

## C.   The Impartial Hearing Officer's Decision

In a July 3, 2012 decision, the IHO found that the March 2011 IEP did not constitute "a suitable program calculated to confer a reasonable education[al] benefit [on C.C.]," and therefore the IEP failed to provide him with a FAPE. (Walsh Aff. (Dkt. No. 21), Ex. A ("IHO Decision") at 26) The IHO's determination turned on (1) the DOE's failure to give proper notice of the summer school site to C.C.'s parents; and (2) the fact that the summer school class C.C. was assigned to was composed of children who were not at his functional level.

As to the first issue, the IHO found that there was no evidence that C.C.'s parents ever received notice of the summer relocation site. (Id. at 24-25) The IHO acknowledged that it would have been "possible [for C.C.'s mother] to visit [P811M at P101M] in June 2011 since it was still open until the end of June." (Id. at 24) The IHO also noted that Santos had testified that "he told all those who called him in June 2011 that the building would be closed in July 2011 and that there were two alternate sites designated for the summer class." (Id.) The IHO discounted Santos's testimony, however, because he "had no idea if he ever spoke to [Plaintiffs]." (Id.) The IHO went on to find that

> there is no evidence whatsoever, documentary or testimonial, that the parents ever received notice from the DOE that the proposed site was closed for the summer and that the summer 2011 program was [relocated] to two different sites. With no response to their letter about arranging a visit, the parents could reasonably believe that placement was simply not available for July 2011 when [C.C.'s] 12-month program was supposed to begin.

(Id. at 25)

As to the second issue, the IHO found that there was no evidence that C.C. "could function successfully in the 6:1:1 setting" or that the offered placement contained other students at the appropriate functioning level. (Id. at 25) The IHO noted that "the class recommended for [C.C.] in June 2011 . . . actually contained, according to [the] class profile . . . , 4 low[-]

17

functioning students out of the 5 children in the class." (Id. at 23) The IHO gave no weight to

Bonnie Segal's testimony "about the relatively high[-]functioning levels of the children in the

[P811M] class that she taught in the summer of 2011," because Segal's testimony was not

consistent with "the DOE's own data on the class profile . . . ." (Id. at 23-24) The IHO also

noted that Segal's testimony that she had provided each child in her summer class with six to

seven hours each week of "one-to-one attention" was not credible, given that "she taught 25

hours per week to the whole class." (Id. at 24)

      The IHO further concluded that had C.C. attended Segal's class, "he would have

been in a class where only 1 of the 5 other children would have been at his functional level." (Id.

at 12) The IHO noted "[t]he children about whom Ms. Segal testified as present in her summer

2011 class with reading levels of 3rd and 4th grade and a writing level of 5th grade for one child

were in fact non-existent on Ms[.] Segal's class register for that summer 2011 class." (Id.)

      The IHO found that, "both procedurally and substantively, the DOE has not met

its . . . burden of providing a FAPE under the [IDEA]." (Id. at 25) The IHO summarized his

findings as follows:

> At the time of the March 2, 2011 CSE meeting[,] there was no evidence presented
> that would demonstrate that [C.C.] could function successfully in the 6:1:1 setting
> made available to the parents. The evidence is that the building site offered to the
> child was for a class where the overwhelming majority of the children were too
> low functioning to provide a FAPE for [C.C.]. The evidence is that the parents
> were presented with a pre-determined outcome where only a 6:1:1 program and
> placement was considered by the CSE and the functionality of the children in the
> class was not considered at all. This was so even though the parents in good faith
> were prepared to visit the 6:1:1 building site to consider it as a placement
> depending on the functional levels of the other children in the class. However, the
> parents never received the opportunity to make that visit because there was no
> DOE response to their letter . . . . This placement of [P811M at P101M] was not
> reasonably calculated to enable the child to obtain meaningful educational
> benefits.

(Id.)

18

The IHO then addressed the second and third prongs of the <u>Burlington/Carter</u> test. Noting that the DOE had not "presented testimonial or documentary evidence that the parents' . . . selection of the Forum School is inappropriate," (<u>id.</u> at 26), the IHO went on to find that the Forum School offered an appropriate program for C.C.  (<u>Id.</u> at 26-29)  As to the third prong, the IHO rejected the DOE's argument that "the parents never seriously considered the public school system in seeking special education services for [C.C.]," finding that "[t]he record is clear . . . that the parents cooperated in good faith at all times with the DOE," and that they "acted reasonably in proceeding with the[] enrollment of [C.C.] at the Forum School."  (<u>Id.</u> at 29-30) The IHO concluded that "equity considerations support the parents with respect to these issues." (<u>Id.</u> at 30)

Having concluded that the parents prevailed on all three prongs of the <u>Burlington/Carter</u> test, the IHO ordered the DOE to reimburse Plaintiffs for private school tuition they paid for the 2011-12 school year.  (<u>Id.</u> at 30)

### D.      The State Review Officer's Decision

The DOE appealed the IHO's decision, arguing, <u>inter alia</u>, that the 6:1:1 class recommendation was appropriate given C.C.'s needs, and was "no more restrictive than the [8:1:3] class" that C.C. had attended at the Rebecca School during the 2010-11 school year.  <u>See</u> Walsh Aff. (Dkt. No. 21), Ex. B ("SRO Decision") at 5-6.  The DOE further argued that (1) because C.C.'s parents had rejected the IEP, the DOE was not required to demonstrate that the proffered public placement site was appropriate; (2) that the parents had received notice of the alternate location for P811M at P101M; and (3) that the IHO had improperly discredited Segal's testimony regarding the functioning levels of the children in her summer class.  (<u>Id.</u> at 6)

C.C.'s parents filed a cross-appeal seeking to have the IHO's decision modified to include a finding that the DOE had denied C.C. a FAPE because, inter alia, (1) "the evaluations considered by the March 2011 CSE were inadequate"; (2) the DOE "failed to offer an appropriate transition plan" to C.C.; (3) the IEP did not provide for parent training and counseling; (4) the DOE had not conducted an FBA; and (5) the DOE had not included Plaintiffs in the school selection process. (Id. at 6)

On March 28, 2013, the SRO reversed the IHO's decision. (Id. at 33) The SRO found that the March 2011 CSE's recommendation of a 12-month school year in a 6:1:1 special class "was appropriately designed to address [C.C.'s] special education needs . . . ." (Id. at 18) According to the SRO, the 6:1:1 placement provided C.C. with a "small, highly structured environment" (id. at 19), which fit his "'highly intensive'" needs of "'individualized attention and intervention'" (id. at 18 (quoting 8 NYCRR § 200.6(h)(4)(ii)(a))). Citing Fochetta's testimony – which "indicated that the CSE's recommendation of a [6:1:1] special class was based on [C.C.'s] needs and was not 'classification driven'" (id. at 18 (citing Tr. 207)) – the SRO concluded that placement in a 6:1:1 classroom was "reasonably calculated to enable [C.C.] to receive educational benefits for the 2011-2012 school year." (Id. at 19)

The SRO also found that – because the parents had rejected the IEP and enrolled C.C. at the Forum School – the DOE was only "required to establish that the IEP was appropriate . . . [and] was not required to establish that the IEP was actually implemented . . . in the proposed classroom[]." (Id. at 28-29) As to the parents' rejection of the IEP, the SRO noted that "[t]he parents indicated their disagreement with the program recommendation for [C.C.] on the Notice of Recommended Deferred Placement, dated March 2, 2011 . . . , and formally rejected the recommended program by letter dated June 16, 2011 . . . ." (Id. at 28 n.25 (citing Tr. 903-04;

Def. Ex. 5 (Dkt. No. 17); Pltf. Ex. J (Dkt. No. 17))) The SRO ruled that where, as here, "it becomes clear that [a] student will not be educated under the proposed IEP, there can be no denial of a FAPE due to the failure to implement the IEP . . . ." (Id. at 28) Because C.C. was never actually educated under the March 2011 IEP, the SRO "decline[d] to review . . . the IHO's finding that [C.C.] was not suitably grouped for instructional purposes in the [DOE's] summer program . . . ." (Id. at 29 n.27)

The SRO further concluded that the DOE's alleged failure to provide written notice of the summer school site to C.C.'s parents had not deprived C.C. of a FAPE. The SRO ruled that, "'[b]ecause the parents' right to participate in the development of their child's IEP does not extend to the DOE's decision regarding the particular school site that their child would attend, the defective notice did not impede this right.'" (Id. at 32 (quoting A.S. v. N.Y.C. Dep't of Educ., No. 10 Civ. 9 (ARR) (RML), at *19 (E.D.N.Y. May 26, 2011), aff'd, 573 F. App'x 63 (2d Cir. 2014)) (citing K.L. ex rel. M.L. v. N.Y.C. Dep't of Educ., No. 11 Civ. 3733 (KBF), 2012 WL 4017822, at *16 (S.D.N.Y. Aug. 23, 2012), aff'd, 530 F. App'x 81 (2d Cir. 2013); S.H. v. N.Y.C. Dep't of Educ., No. 10 Civ. 1041 (PKC), 2011 WL 666098, at *5 (S.D.N.Y. Feb. 15, 2011))) The SRO also found it unnecessary to resolve the conflict between Santos's testimony and that of C.C.'s mother as to what Santos told her about the summer relocation of P101M, because "the law applicable to this issue does not necessitate actual notice [to] . . . the parents [of a placement location] . . . ." (Id. at 32 n.30 (citing Tr. 302, 306-07, 813-14))

Finally, the SRO found that the CSE's failure to (1) conduct a functional behavior assessment and develop a behavior intervention plan; (2) provide for parental training and counseling in the IEP; and (3) include a transition plan in the IEP, did not rise to the level of a denial of a FAPE. (Id. at 22-28) With respect to the behavioral intervention plan, the SRO

21

determined that "the hearing record supports the [DOE's] contention that [C.C.] did not require a

BIP, that the CSE properly considered special factors related to [C.C.'s] behavior that impeded

his learning, and that the March 2011 IEP appropriately addressed [C.C.'s] behavioral needs."

(Id. at 24)  While acknowledging that, "in the case of a student whose behavior impedes his or

her learning or that of others," the IDEA requires a CSE to "consider positive behavioral

interventions and supports, and other strategies, to address that behavior" (id. (citing 20 U.S.C.

§ 1414(d)(3)(B)(i); 34 C.F.R. 300.324(a)(2)(i); 8 NYCRR § 200.4(d)(3)(i))), the SRO found that

no BIP was necessary given the facts of this case: "[a]lthough the IEP note[s] that [C.C.],

'[w]hen in an overstimulated state, which happens less frequently, . . . will jump hard, make a

squealing noise and try to wrestle with other people around him,' the school psychologist

testified that, to her recollection, such behavior occurred infrequently, [and] that the description

was included 'because of the potential for it to happen[.]'"  (Id. at 26 (citing Tr. 259; Def. Ex. 7

(Dkt. No. 17) at 4))  Moreover, "[a]ccording to the March 2011 IEP, [C.C.'s] behavior does not

seriously interfere with instruction and [can] be addressed by a special education teacher."  (Id.

(citing Def. Exs. 7 at 4, 8 at 2 (Dkt. No. 17)))  The SRO also cited a number of reports and

evaluations in the record indicating that C.C.'s behavior does not impede his learning or the

learning of others.  (Id. at 26-27 (citing Def. Exs. 7, 8, 12-15 (Dkt. No. 17)))  The SRO

concluded that,

> [i]n light of [this evidence], . . . the lack of a BIP does not compel a finding that
> the [DOE] failed to offer [C.C.] a FAPE, particularly where[,] as here, there was
> agreement between the information before the March 2011 CSE and the resultant
> IEP as to the function of [C.C.'s] behaviors; the March 2011 CSE accurately
> identified [C.C.'s] behavior needs in the March 2011 IEP[;] and the March 2011
> CSE addressed [C.C.'s] behavior needs based on information and documentation
> provided by [C.C.'s] providers . . . .

(Id. at 27)

22

As to the absence of a provision for parental training and counseling in the IEP, the SRO noted that, "'[alt]hough the failure to include parent counseling in the IEP may, in some cases (particularly when aggregated with other violations), result in a denial of a FAPE, in the ordinary case that failure, standing alone, is not sufficient to warrant reimbursement[.]'" (Id. at 24 (quoting R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 191 (2d Cir. 2012)) (citations omitted)) The SRO found that, "[i]n this case, the record reflects that the CSE discussed parent counseling and training during the March 2011 CSE meeting . . . , but did not recommend these services on [C.C.'s] 2011-12 IEP . . . ." (Id. (citing Tr. 175; Def. Exs. 7-8 (Dkt. No. 17)) The SRO further noted that "neither the parents' claim by itself nor the evidence adduced in the hearing record offer much in the way of insight or rationale regarding how the failure to specify parent counseling and training on [C.C.'s] IEP in this instance rose to the level of a denial of a FAPE . . . ." (Id.) Accordingly, the SRO concluded that, "although the . . . CSE's failure to recommend parent counseling and training in [C.C.'s] IEP was a violation of State regulation, such a violation is not sufficient in this case to support a finding that the [DOE] failed to offer [C.C.] a FAPE . . . ." (Id. (citations omitted))

As to the absence of a transition plan in the IEP, the SRO found that "the IDEA does not require a 'transition plan' as part of a student's IEP when a student moves from one school to another," and that even if such a requirement existed, the SRO was "not persuaded that the absence of a private school to public school transition plan rose to the level of a denial of a FAPE to the student . . . ." (Id. at 23 (citations omitted))

Having found that the proposed IEP was reasonably calculated to enable C.C. to receive educational benefits for the 2011-12 school year, and that none of the violations alleged by Plaintiffs amounted to a denial of a FAPE, the SRO concluded that the DOE had offered C.C.

a FAPE, and that the IHO's decision awarding tuition reimbursement to Plaintiffs should be reversed. (Id. at 33)  The SRO did not reach the issue of whether the Forum School provided an appropriate program for C.C., or whether the equities favored the parents. (Id.)

*     *     *     *

Plaintiffs filed the instant action on June 6, 2013.  (Cmplt. (Dkt. No. 1))  They allege procedural and substantive violations of the IDEA that amount to a deprivation of a FAPE for C.C., and seek to have the IHO's decision reinstated.  (Id.)  The parties have cross-moved for summary judgment.  (Dkt. Nos. 29, 35)

**DISCUSSION**

## I.   STANDARD OF REVIEW

"'The responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers. Their rulings are then subject to independent judicial review.'" M.H., 685 F.3d at 240 (quoting Walczak, 142 F.3d at 129) (internal quotation marks omitted). "In considering an IDEA claim, a district court 'must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence.'" C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 837-38 (2d Cir. 2014) (quoting Gagliardo, 489 F.3d at 112); see also 20 U.S.C. § 1415(i)(2)(C)(iii). However, "'[t]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed.'" C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 77 (2d Cir. 2014) (quoting Gagliardo, 489 F.3d at 112-13 (internal quotation marks omitted)). "[C]ourts are 'restrained by [their] lack of specialized knowledge and educational expertise; [they] must defer to the administrative decision particularly where the state officer's review has been thorough and careful.'" N.S. v. N.Y.C.

24

Dep't of Educ., No. 13 Civ. 7819 (VEC), 2014 WL 2722967, at *6 (S.D.N.Y. June 16, 2014) (alteration omitted) (quoting M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ., 725 F.3d 131, 138-39 (2d Cir. 2013) (internal quotation marks omitted)).

> "The deference owed depends on both the quality of the [administrative] opinion and the court's institutional competence." C.F., 746 F.3d at 77 (alteration added) (footnote omitted) (citing M.H., 685 F.3d at 244). To determine the quality of an opinion, "'courts must look to the factors that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court.'" M.W., 725 F.3d at 139 (citation omitted) (quoting R.E., 694 F.3d at 189) (internal quotation marks omitted). The institutional competence question hinges on whether a matter involves "persistent and difficult questions of educational policy," C.L., 744 F.3d at 838 (citation omitted) (internal quotation marks omitted), or "'issues of law, such as the proper interpretation of the federal statute and its requirements.'" N.S., 2014 WL 2722967, at *6 (quoting Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.3d 77, 82 (2d Cir. 2005) (alteration omitted)) (citation omitted) (internal quotation marks omitted).[11]

---

[11] The Second Circuit has offered the following guidance concerning the deference owed to an administrative officer's findings in an IDEA case:

> "[D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures . . . . Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not. And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency."

C.F., 746 F.3d at 77 n.7 (quoting M.H., 685 F.3d at 244 (internal citations omitted)).

"'[W]hen an IHO and SRO reach conflicting conclusions, [courts] defer to the final decision of the state authorities, that is, the SRO's decision.'" C.L., 744 F.3d at 838 (quoting R.E., 694 F.3d at 189).  However, "[w]here the SRO's decision . . . is 'insufficiently reasoned to merit deference,' and the IHO's decision is 'more thorough and carefully considered,' the reviewing court may consider and defer to the IHO's decision." Id. (alterations added) (quoting R.E., 694 F.3d at 189).

"'The party appealing an SRO's determination bears the burden of proof in establishing that the SRO's decision is not entitled to deference.'" M.L. v. N.Y.C. Dep't of Educ., No. 13 Civ. 00574 (ALC) (JLC), 2014 WL 1301957, at *7 (S.D.N.Y. Mar. 31, 2014) (quoting E.H. v. N.Y.C. Dep't of Educ., No. 12 Civ. 6639 (GBD), 2014 WL 1224417, at *3 (S.D.N.Y. Mar. 21, 2014)).  Moreover, a party "seeking to have a reviewing court credit an IHO's determination over an SRO's determination would benefit from calling [the court's] attention to an SRO's specific errors in law, fact, or reasoning." M.W., 725 F.3d at 139. "[W]here an SRO decision 'is reasoned and supported by the record,' the district court should not disturb it." Weaver v. Millbrook Cent. Sch. Dist., 812 F. Supp. 2d 514, 521 (S.D.N.Y. 2011) (quoting Gagliardo, 489 F.3d at 114).

26

## II.    WHETHER THE DOE PROVIDED C.C. WITH A FAPE[12]

"Where the state fails to provide a FAPE to a disabled child, the parents may enroll the child in a private school and seek reimbursement for the cost of the private school education from the local education agency." C.L., 744 F.3d at 831 (citation omitted).  In order to determine eligibility for tuition reimbursement, "[t]he Supreme Court has established the three-pronged Burlington/Carter Test . . . , which [considers] (1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities."[13] C.F., 746 F.3d at 73 (citing Frank G., 459 F.3d at 363).

Under the first prong of the Burlington/Carter test, "the Court reviews the procedural and substantive adequacy of the IEP." M.L., 2014 WL 1301957, at *8 (citing

---

[12]  Before embarking on a review of the SRO's determinations, it must be acknowledged that the SRO's 33-page, single-spaced opinion carefully and exhaustively addresses Plaintiffs' claims, and is fully "deserving [of] the ordinary level of deference granted to such final state administrative decisions." R.B. v. N.Y.C. Dep't of Educ., 15 F. Supp. 3d 421, 428 (S.D.N.Y. 2014) (citing K.L., 530 F. App'x at 85), aff'd, No. 13-4187, 2014 WL 5463084 (2d Cir. Oct. 29, 2014).  This Court also notes that, under the Second Circuit authority discussed above, deference to the SRO's findings is appropriate:  the SRO's decision (1) turns on the substantive adequacy of the IEP formulated for C.C.; (2) is "grounded in thorough and logical reasoning"; and (3) is premised on the same evidence presented to this Court.  See C.F., 746 F.3d at 77, n.7.

Plaintiffs argue, however, that the SRO's decision "should not be considered at all," because it was issued 171 days late.  (Pltf. Br. (Dkt. No. 30) at 22)  The untimeliness of the SRO's decision does not suggest a flaw in its logic and reasoning, however.  Moreover, Plaintiffs have cited no authority supporting their assertion that an SRO decision is entitled to no deference when issued outside the "30-day statutory timeline."  See M.L., 2014 WL 1301957, at *13 ("Although the Court agrees with Plaintiffs that the State Review Office's routine delays in issuing decisions is problematic, it has found no authority in IDEA cases that allows it to declare the SRO's decision a nullity.") (internal quotation marks omitted).

[13]  The Burlington/Carter test is the product of two Supreme Court decisions:  Sch. Comm. Of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359 (1985), and Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter, 510 U.S. 7 (1993).

Walczak, 142 F.3d at 129). First, "courts examine whether there were procedural violations of

the IDEA, namely 'whether the state has complied with the procedures set forth in the IDEA.'"

R.E., 694 F.3d at 190 (quoting Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir.

2005)). "The statute is clear, however, that not every violation of the IDEA'[s] procedural

requirements will result in the denial of a FAPE." R.B. v. N.Y.C. Dep't of Educ., No. 12 Civ.

3763 (AJN), 2013 WL 5438605, at *8 (S.D.N.Y. Sept. 27, 2013), aff'd, 589 F. App'x 572 (2d

Cir. 2014). "Rather, a procedural violation will constitute a denial of a FAPE 'only if the

procedural inadequacies (i) impeded the child's right to a free appropriate public education;

(ii) significantly impeded the parents' opportunity to participate in the decisionmaking process

regarding the provision of a free appropriate public education to the parents' child; or (iii) caused

a deprivation of educational benefits.'" D.B. v. N.Y.C. Dep't of Educ., 966 F. Supp. 2d 315, 329

(S.D.N.Y. 2013) (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)). "Multiple procedural violations may

cumulatively result in the denial of a FAPE[, however,] even if the violations considered

individually do not." R.E., 694 F.3d at 190 (citing Werner v. Clarkstown Cent. Sch. Dist., 363 F.

Supp. 2d 656, 659 (S.D.N.Y. 2005)).

   "Second, courts 'examine whether the IEP was substantively adequate, namely

whether it was reasonably calculated to enable the child to receive educational benefits.'" C.F.,

746 F.3d at 79 (quoting R.E., 694 F.3d at 190). "Pursuant to Second Circuit precedent, an IEP is

substantively adequate if it is 'likely to produce progress, not regression and affords the student

. . . an opportunity greater than mere trial advancement.'" R.B., 2013 WL 5438605, at *12

(citation omitted) (quoting E.S. ex rel. B.S. v. Katonah Lewisboro Sch. Dist., 487 F. App'x 619,

621 (2d Cir. 2012)) (internal quotation marks omitted).

### A.    DOE's Compliance with the Procedural Requirements of the IDEA

Plaintiffs argue that the DOE committed procedural violations under the IDEA by

(1) failing to conduct a functional behavior assessment or develop a behavioral intervention plan

to address C.C.'s interfering behaviors (Pltf. Br. (Dkt. No. 30) at 20-21); (2) failing to provide

C.C. with a "transition plan to assist C.C. in his ostensible transition from one school to another"

(id. at 19); (3) formulating an IEP that did not provide for parental training and counseling (id. at

21); and (4) failing to provide written notice of P811M at P101M's relocated summer site to

C.C.'s parents.  (Id. at 11-14)

#### 1.    Failure to Conduct a Functional Behavior Assessment
#### and Develop a Behavior Intervention Plan

Plaintiffs argue that, under the IDEA, the DOE was required to conduct a

functional behavior assessment of C.C. prior to the March 2011 CSE meeting, and to include a

behavior intervention plan in the March 2011 IEP. (Id. at 20-21) Plaintiffs contend that "C.C.'s

unique behaviors interfere with his learning process" and that, as a result, he needed "a

comprehensive and adequate BIP . . . to address those behaviors." (Pltf. Br. (Dkt. No. 30) at 20)

Plaintiffs further state that, "if there is no FBA, the IEP must otherwise properly identify the

problem behaviors and properly prescribe ways to manage them" (Pltf. Reply Br. (Dkt. No. 33)

at 7 (emphasis omitted)), and that here the "DOE offered C.C. absolutely nothing to address his

behaviors . . . ." (Pltf. Br. (Dkt. No. 30) at 20)

##### a.    Applicable Law

A functional behavior assessment, or FBA, provides an "identification of [a

disabled student's] problem behavior, [its] definition . . . in concrete terms, the . . . contextual

factors that contribute to [it] . . . and the formulation of a hypothesis regarding the general

conditions under which [the] behavior usually occurs." 8 NYCRR § 200.1(r) (alterations added).

29

IEPs sometimes address a student's interfering behavior through a behavioral intervention plan ("BIP"), which is "a plan that is based on the results of a functional behavioral assessment and, at a minimum, includes a description of the problem behavior, global and specific hypotheses as to why the problem behavior occurs[,] and intervention strategies that include positive behavioral supports and services to address the behavior." Id. § 200.1(mmm).

"A school district is required to conduct an FBA only where it determines that the behavior at issue is sufficiently serious as to 'impede' the student's learning and where such an assessment is 'necessary' to ascertain the causes of the problematic behavior." M.S. v. N.Y.C. Dep't of Educ., No. 12 Civ. 3533 (NG), 2013 WL 7819319, at *10 (E.D.N.Y. Nov. 5, 2013) (finding that, although there was some evidence that the student "displayed behaviors that impacted his ability to learn, the [administrative] record reflect[ed] that his private school teacher reported to the IEP team that [the student's] behavior was not presently a problem," and thus his "behavior did not seriously 'impede' his or other students' instruction so as to require a functional behavior assessment"); see also M.W., 725 F.3d at 140 (quoting A.C. ex rel M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 172 (2d Cir. 2009)) ("The IDEA only requires a school district to 'consider the use of positive behavioral interventions and supports, and other strategies' when a child's behavior impedes learning."); P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ. (Region 4), 819 F. Supp. 2d 90, 107 (E.D.N.Y. 2011) (alterations added) (finding that no FBA was required where the student's "mother, special education teacher and speech therapist [all reported] that [the student's] interfering behaviors were diminished and well under control"), aff'd, appeal dismissed, 526 F. App'x 135 (2d Cir. 2013).

Even where it is evident that a student's behavior impedes his or other students' learning, however, "[t]he failure to conduct an FBA does not automatically constitute denial of a

FAPE[.]" M.L., 2014 WL 1301957, at *9 (citing A.C., 553 F.3d at 172). "[W]hen an IEP adequately addresses a child's interfering behaviors, the procedural requirements of the IDEA are satisfied." Id.; see also N.S., 2014 WL 2722967, at *8 (citation omitted) (internal quotation marks omitted) (finding that the failure to conduct an FBA "does not render an IEP legally inadequate under the IDEA so long as the IEP adequately identifies a student's behavioral impediments and implements strategies to address that behavior"). "[W]hether an IEP adequately addresses a disabled student's behaviors and whether strategies for dealing with those behaviors are appropriate are 'precisely the type of issue[s] upon which the IDEA requires deference to the expertise of the administrative officers.'" M.W., 725 F.3d at 140 (citing A.C., 553 F.3d at 172).

### b.   Analysis

Here, the CSE did not arrange for a functional behavior assessment of C.C. prior to formulating the March 2011 IEP, nor did it develop a behavior intervention plan in conjunction with that IEP. See Def. Ex. 7 (Dkt. No. 17) at 4. While the IHO did not address whether the DOE deprived C.C. of a FAPE by failing to conduct an FBA or develop a BIP (see IHO Decision (Dkt. No. 21)), the SRO concluded that "the hearing record supports the [DOE's] contention that [C.C.] did not require a BIP[;] that the CSE properly considered special factors related to [C.C.'s] behavior that impeded his learning[;] and that the March 2011 IEP appropriately addressed [C.C.'s] behavioral needs." (Id. at 24)  The record fully supports the SRO's conclusions.

Fochetta – the DOE's psychologist – testified that C.C.'s teacher from the Rebecca School told her that C.C.'s "behavior does not seriously interfere with instruction." (Tr. 192) Fochetta also testified that C.C.'s "interfering behavior" occurs "not frequently at all." (Id.

at 258-59) Friedman – one of C.C.'s home therapists – testified that C.C.'s "biggest issue[s]" are "his cognitive difficulties [and] his regulation," and that "[his] behaviors are [a] fraction of the overall picture." (Tr. 754) Furthermore, a "Classroom Observation Report" concerning C.C. conducted on December 7, 2010 states that "[i]n general, [C.C.] was quiet and non-disruptive in class." (Def. Ex. 14 (Dkt. No. 17) at 2) Similarly, a psychodiagnostic evaluation report conducted in January 2010 found that C.C. is "a sweet youngster who [is] mild mannered"; that he "does not taunt or bully"; that he "demonstrates good sportsmanship and uses manners"; and that he "is well behaved and transitions easily [between activities]." (Def. Ex. 15 (Dkt. No. 17) at 5, 7) Accordingly, the record includes ample support for the SRO's finding that C.C.'s behavior did not impede his or other students' learning.

To the extent that C.C.'s behavior presents any issue in the classroom, the March 2011 IEP adequately addresses that concern. The IEP acknowledges that "[w]hen in an over stimulated state, which happens less frequently, [C.C.] will jump hard, make a squealing noise[,] and try to wrestle with other people around him." (Def. Ex. 7 (Dkt. No. 17) at 4) The IEP provides strategies for managing this behavior, however, advising that when C.C. is in an "over stimulated state" he "requires firm and clear limits [about] keeping his hands on his own body. He benefits from co-regulation through modeling a calm state (deep breathing and using a calm voice)." (Id.) Fochetta testified that the CSE included this description of C.C.'s minor disruptive behaviors in the IEP "because of the potential for it to happen and so that the staff working with [C.C.] would be [a]ware of it . . . and how to deal with it." (Tr. 259) Given the consistent testimony and reports summarized above, however, there is no reason to question the March 2011 IEP's conclusion that C.C.'s "[b]ehavior does not seriously interfere with instruction [and] . . . [c]an be addressed by [his] special education teacher." (Def. Ex. 7 (Dkt. No. 17) at 4)

32

Because the SRO properly concluded that C.C.'s behavior does not seriously interfere with classroom instruction, and because the IEP adequately addresses C.C.'s minor behavioral issues, no FBA or BIP was necessary. Accordingly, the "failure to conduct a[n] [FBA] did not deny [C.C.] a [FAPE]." M.S., 2013 WL 7819319, at *10.

## 2.    Failure to Provide C.C. with a Transition Plan

Plaintiffs argue that the DOE "failed to create any transition plan to assist C.C. in his ostensible transition from [the Rebecca School] to [P811M] . . . ." (Pltf. Br. (Dkt. No. 30) at 19)  While "Plaintiffs insist that [this omission constitutes] a procedural violation [under the IDEA], . . . they do not cite to any law entitling them to a transition plan in the IEP." F.L. ex rel. F.L. v. N.Y.C. Dep't of Educ., No. 11 Civ. 5131 (RKE), 2012 WL 4891748, at *9 (S.D.N.Y. Oct. 16, 2012). Indeed, "there is no requirement that an IEP specify a transition plan for a student attending a new school placement." A.L. v. N.Y.C. Dep't of Educ., 812 F. Supp. 2d 492, 505 (S.D.N.Y. 2011) (citing E.Z.-L. ex rel. R.L. v. N.Y.C. Dep't of Educ., 763 F. Supp. 2d 584, 598 (S.D.N.Y. 2011)); see also R.E., 694 F.3d at 195 ("[Plaintiffs] . . . have not identified any legal requirement that an IEP contain a transition plan . . . .").

Plaintiffs contend, however, that the SRO "failed to apply the appropriate legal standard and analysis [to this issue]," because the "question is not whether a 'transition plan' is a specific requirement in the IDEA, but rather [whether] failing to plan for transition for C.C. was reasonably calculated [to afford him a FAPE] given his unique challenges and deficits." (Pltf. Br. (Dkt. No. 30) at 19 (emphasis in original))  In support of this argument, Plaintiffs cite the testimony of Amanda Friedman, "one of C.C.'s therapists in his home program," who "explained that [C.C.] needed additional support because of his transitions between schools." (Id. (citing Tr. 726))  Although Friedman's testimony indicates that C.C. would benefit from the home therapy

33

services she offers in transitioning between schools, it does not establish that the CSE deprived

C.C. of a FAPE by not including a transition plan in the March 2011 IEP. See Tr. 726.

Because Plaintiffs "have not identified any legal requirement that an IEP contain a

transition plan, nor have they articulated why the absence of such a plan was so significant as to

deny [C.C.] a FAPE," R.E., 694 F.3d at 195, this Court agrees with the SRO's determination that

"the absence of a private school to public school transition plan [does not rise] to the level of a

denial of a FAPE to [C.C.]." (SRO Decision (Dkt. No. 21) at 23)

### 3.   Failure to Provide for Parental Training and Counseling

Plaintiffs argue that the IEP's failure to provide for parental counseling and

training denied C.C. a FAPE. (Pltf. Br. (Dkt. No. 30) at 21)  The IHO did not address this issue.

The SRO concluded that this omission did not deny C.C. a FAPE, noting that counseling and

training had been discussed at the CSE meeting, and that Plaintiffs had offered no "insight or

rationale regarding how the failure to specify parent counseling and training on [C.C.'s] IEP . . .

rose to the level of a denial of a FAPE . . . ." (SRO Decision (Dkt. No. 21) at 24)

"New York law requires school districts to include provisions [addressing] parent

counseling and training [in IEPs]." C.F., 746 F.3d at 79 (citing 8 NYCRR §§ 200.1(kk),

200.13(d)). "'Parent counseling and training means assisting parents in understanding the

special needs of their child; providing parents with information about child development; and

helping parents to acquire the necessary skills that will allow them to support the implementation

of their child's individualized education program.'" R.E., 694 F.3d at 191 (quoting 8 NYCRR §

200.1(kk)). The Second Circuit has "described counseling omissions as procedural violations

'less serious than the omission of an FBA' because 'the presence or absence of a parent-

counseling provision does not necessarily have a direct effect on the substantive adequacy of the

34

plan.'" M.W., 725 F.3d at 141 (quoting R.E., 694 F.3d at 191). "Moreover, because school districts are required by section 200.13(d) to provide parent counseling, they remain accountable for their failure to do so no matter the contents of the IEP. Parents can file a complaint at any time if they feel they are not receiving this service." R.E., 694 F.3d at 191.

Consequently, the "failure to provide counseling ordinarily does not result in a FAPE denial . . . ." M.W., 725 F.3d at 142 (citation omitted). "This is especially so when the parents have 'received extensive parent training in the past and have been actively involved in their child's education, communicating regularly with teachers and service providers.'" M.L., 2014 WL 1301957, at *8 (quoting M.M. ex rel. A.M. v. N.Y.C. Dep't of Educ., 583 F. Supp. 2d 498, 509 (S.D.N.Y. 2008)); see also E.F. v. N.Y.C. Dep't of Educ., No. 12 Civ. 2217 (MKB), 2013 WL 4495676, at *22 (E.D.N.Y. Aug. 19, 2013) (concluding that the omission of provisions in IEP addressing parental counseling did "not amount to a denial of a FAPE" because parents "received . . . training in prior years and under New York law they could petition to have [it] . . . if it was not offered"); A.D. v. N.Y.C. Dep't of Educ., No. 12 Civ. 2673 (RA), 2013 WL 1155570, at *12 & n.5 (S.D.N.Y. Mar. 19, 2013) (finding that the omission of parental counseling did not render the IEP inadequate where "the Parents have had adequate access to [such services] for several years," including weekly phone calls and "very good communication" with the school); F.L., 2012 WL 4891748, at *10 (finding no denial of a FAPE where "parent training was discussed at the IEP meeting" and evidence showed that the training was available at the assigned school), aff'd, 553 F. App'x 2 (2d Cir. 2014). In sum, "while a failure to provide parent counseling and training may – in combination with other deficiencies – contribute to denial of a FAPE, . . . it alone is insufficient to rise to the level of denial thereof." F.B. v. N.Y.C.

Dep't of Educ., 923 F. Supp. 2d 570, 585 (S.D.N.Y. 2013) (emphasis in original) (internal citation omitted).

Here, the March 2011 IEP does not provide for parental training and counseling as required by law. See Def. Ex. 7 (Dkt. No. 17). The March 2011 CSE meeting minutes indicate, however, that parent training was discussed at that meeting. (Def. Ex. 8 (Dkt. No. 17) at 1) Moreover, Plaintiffs have not alleged that parental training and counseling services were unavailable at the assigned school or that these services would not have been provided on request. The record also demonstrates that C.C.'s parents have been actively involved in his education since at least 2008, and have been quite proactive in determining an appropriate placement and program for their child. Indeed, C.C.'s parents disputed the adequacy of his IEP every year from 2008 through 2011, and have repeatedly filed due process complaints leading to numerous administrative proceedings.

This Court agrees with the SRO's conclusion that "neither the parents' claim by itself nor the evidence adduced in the hearing record offer much in the way of insight or rationale regarding how the failure to specify parent counseling or training on [C.C.'s] IEP in this instance rose to the level of a denial of a FAPE." (SRO Decision (Dkt. No. 21) at 24) This Court concludes that although the DOE's failure to provide for parental counseling and training in the IEP violated state law, that omission does not rise to the level of a denial of a FAPE to C.C.

### 4.    Failure to Provide Written Notice of P811M at P101M's Relocated Summer Site

Plaintiffs argue that "the DOE failed to provide 'prior written notice' of a viable and operating school placement that C.C. could actually attend," because the June 10, 2011 Final Notice of Recommendation "was for a school that was closed for the first two months of the school year[.]" (Pltf. Reply Br. (Dkt. No. 33) at 3 (emphasis in original); see also Pltf. Br. (Dkt.

No. 30) at 11-14)) Plaintiffs further contend that the failure to give them proper notice of C.C.'s placement constitutes both a procedural violation of the IDEA and "a serious substantive . . . FAPE deprivation." (Pltf. Reply Br. (Dkt. No. 33) at 3-4 (emphasis and footnote omitted))

Ignoring the conflict between the testimony of Santos and C.C.'s mother, the DOE responds that it is undisputed that the two spoke about the school closure, and that as a result "Plaintiffs were fully aware, and completely on notice, that the closure of P101[M] did not mean that there was no placement available for C.C. . . ." (Def. Br. (Dkt. No. 36) at 14) The DOE further contends that because Plaintiffs "were on actual notice that C.C. would attend P811M for the summer months at a different site of the school, it was harmless error that the [Final Notice of Recommendation] did not include a second site location or that the DOE did not issue a second [Final Notice of Recommendation] specifically for the summer." (Id.) Finally, the DOE argues that "any procedural flaw [related to the Final Notice of Recommendation] is harmless[,] as the record establishes that the notice error had no bearing on the parents' decision to reject the placement." (Id. (citation omitted) (internal quotation marks omitted))

As discussed above, the IHO found that there was no evidence that C.C.'s parents ever received notice of the summer relocation site for the proffered placement. (IHO Decision (Dkt. No. 21) at 24-25) The IHO acknowledged that (1) when C.C.'s mother called on June 16, 2011, P811M at P101M was open (and would remain open until the end of June) and could have been visited; and (2) Santos had testified that he told all the parents who called in June 2011 that P101M "would be closed in July 2011 and that there were two alternate sites designated for the summer class [of P811M at P101M]." (Id. at 24) The IHO discounted Santos's testimony, however, because he had "made no record of those who called him, and he had no idea if he ever spoke to [Plaintiffs]." (Id.)

37

The IHO concluded that

[t]he evidence is that the parents received the [Final Notice of Recommendation] on June 10, 2011 . . . and sent a letter to the CSE . . . chairperson on June 16, 2011 to arrange to visit the proposed placement site . . . . The parents present[ed] a fax confirmation that their letter was received by the DOE, but there is no evidence that they ever received a response. In fact, there is no evidence whatsoever, documentary or testimonial, that the parents ever received notice from the DOE that the proposed site was closed for the summer and that the summer 2011 program was relocated to two different sites.

(Id. at 24-25) The IHO further found that, "[w]ith no response to their letter about arranging a visit, the parents could reasonably believe that placement was simply not available for July 2011 when [C.C.'s] 12-month program was supposed to begin." (Id. at 25) The IHO therefore concluded that, because "the parents never received the opportunity to make [a] visit [to the proposed placement site] because there was no DOE response to their letter," the DOE denied C.C. a FAPE. (Id.)

The SRO rejected the IHO's determination that the failure to provide proper written notice of the summer school site to C.C.'s parents constituted a denial of a FAPE. As an initial matter, the SRO noted that the DOE has no obligation to identify a specific school site in an IEP. (SRO Decision (Dkt. No. 21) at 30 (citations omitted) ("While statutory and regulatory provisions require an IEP to include the 'location' of the recommended special education services . . . , it does not follow that an IEP must identify a specific school site . . . .")) The SRO also noted that parents have no right to participate in "the selection of the student's specific school building or classroom." (Id. at 31 ("[T]he parents' right to meaningfully participate in the educational placement process – that is, the development of [C.C.'s] IEP – does not extend to the selection of [C.C.'s] specific school building or classroom . . . .")) Accordingly, although the DOE "failed to provide adequate written notice of the school to which the student was assigned," the "defective notice did not impede" Plaintiffs' "right to participate in development of [C.C.'s]

38

IEP," because that right "does not extend to the DOE's decision regarding the particular school site that [C.C.] would attend." (Id. at 32 (citations omitted) (internal quotation marks omitted))

The SRO found that the DOE "developed [C.C.'s] 2011-12 IEP and offered [C.C.] a placement by June 10, 2011, prior to the start of the 12-month school year, and was therefore in conformity with State and federal regulations . . . ." (Id. at 30)  According to the SRO, although the DOE provided C.C.'s parents with a "defective notice" concerning the site for P811M at P101M's summer school (id. at 32 (quotation marks and citation omitted)), the defective notice did not violate any of the parents' rights under the IDEA, because "the law applicable to this issue does not necessitate actual notice [of a school placement site] on the part of the parents." (Id. at 32 n.30)  For the same reason, the SRO found that she "need not resolve [the] credibility determination [between Santos and C.C.'s mother]." (Id.)

The SRO also repeatedly pointed out that C.C.'s parents had rejected the IEP as inadequate prior to the start of the school year. (Id. at 3 (noting C.C.'s mother's rejection of IEP on Notice of Recommended Deferred Placement); id. at 4 (citing C.C.'s mother's June 16, 2011 letter stating that the "proposed 2011-12 IEP [was] not appropriate for the student" and that if the DOE did not provide an appropriate program "the student would attend the Forum School"); id. at 28 ("In this case, it is undisputed by the parties that the parents rejected the IEP and enrolled the student at the Forum School for the 2011-12 school year."); id. at 28 n.25 (citation omitted) ("The parents indicated their disagreement with the program recommendation for the student on the Notice of Recommended Deferred Placement . . . , dated March 2, 2011 and formally rejected the recommended program by letter dated June 16, 2011 . . . . "); id. at 30 ("It is undisputed that the parents rejected the [DOE's] program prior to the start of the school year and enrolled [C.C.] at the Forum School . . . ."); id. (noting that "the parents rejected the student's

IEP on June 16, 2011"); id. (alluding to fact that C.C.'s parents had "rejected placement under the proposed IEP"))

a. **Applicable Law**

"The IDEA requires school districts to 'ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child.'" C.F., 746 F.3d at 79 (emphasis in original) (citing 29 U.S.C. § 1414(e)). The Second Circuit has "interpreted the term 'educational placement' to refer to the 'general educational program – such as the classes, individualized attention and additional services a child will receive – rather than the 'bricks and mortar' of the specific school." Id. (quoting T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 419 (2d Cir. 2009)). As a result, "[t]he requirement that an IEP include the 'location' of recommended special education services does not mean that the IEP must identify a specific building site in a multi-school district to which the child will be assigned." J.L. v. City Sch. Dist. of City of New York, No. 12 Civ. 1516 (CM), 2013 WL 625064, at *10 (S.D.N.Y. Feb. 20, 2013). Instead, "'location' means the general setting in which the services will be provided." T.Y., 584 F.3d at 419 (citation omitted). Accordingly, "because there is no requirement in the IDEA that the IEP name a specific school location, [a student's] IEP [will] not [be] procedurally deficient for that reason." Id. at 420.

It is likewise clear that a school district "may select the specific school without the advice of the parents so long as it conforms to the program offered in the IEP." R.E., 694 F.3d at 191-92 (citation omitted).

The Second Circuit has also instructed that a school district's "failure to specify a school site [after the issuance of an IEP] . . . does not 'constitute a per se procedural violation of

40

the IDEA.'"  C.F., 746 F.3d at 79 (quoting T.Y., 584 F.3d at 419).  The facts of C.F. are somewhat analogous to the facts here:

C.F. – an autistic boy – attended a private school in Manhattan for the 2006-07 and 2007-08 school years.  Id. at 73.  A CSE convened in May 2008 to formulate C.F.'s IEP for the 2008-09 school year.  Id.  "Neither the Committee nor the IEP specified the school placement site.  However, on June 17, 2008, the [DOE] sent [C.F.'s parents] a final notice of recommendation, placing C.F. at PS 169 located at PS 102 [in Manhattan], starting in July 2008."  Id. at 73-74.

"[A]fter [C.F.'s father received] the final notice of recommendation, he attempted to contact C.F.'s placement school through phone calls and letters, but was unable to do so."  Id. at 75.  "C.F.'s parents [then] sent a letter rejecting the proposed placement" and enrolled C.F. in a private special education school.  Id. at 74.  It turned out that "while C.F.'s proposed placement started in July, the [assigned school] site was not ready until September.  Prior to that time, [C.F.'s assigned school] was located [at a different location]."  Id. at 74-75.  A DOE witness testified that, "had a parent attempted to visit [C.F.'s assigned school] in July, the parent would have been directed to [the alternate location]."  Id. at 75

The IHO held that the DOE "failed to provide C.F. with a [FAPE]," based, in part, on "C.F.'s placement in a school site not open until September and [his father's] inability to make contact with anyone at the placement site."  Id. at 76.  The SRO reversed, finding that "the issue of C.F.'s school placement site was foreclosed because [p]laintiffs failed to challenge it in the due process complaint."  Id.  Plaintiffs appealed, and the district court affirmed the SRO's decision.  Id. (citing C.F. v. N.Y.C. Dep't of Educ., No. 11 Civ. 00157 (LTS), 2011 WL 5130101 (S.D.N.Y. Oct. 28, 2011)).

On appeal, the Second Circuit reversed, finding that plaintiffs' due process complaint had put the DOE on notice of plaintiffs' claim "concerning the lack of availability of the proposed [school] site prior to September." Id. at 78. As to the merits of plaintiffs' claims, the Second Circuit found that the DOE had complied with the procedural requirements of the IDEA, despite its failure to notify plaintiffs of the relocated summer school site:

> [W]hile the failure to specify a school site may render an IEP substantively inadequate, it does not "constitute a per se procedural violation of the IDEA." T.Y., 584 F.3d at 419. Here, the Department complied with the IDEA by including C.F.'s parents in the determination of the type of placement, the 6:1:1 placement at a [DOE] school. While we acknowledge the difficulties that Plaintiffs had in communicating with the school site, these difficulties did not change the type of placement and therefore did not violate the procedures of the IDEA.

Id. at 79. The court did not return to the question of whether the DOE's failure to notify plaintiffs of the relocated summer school site rendered the IEP substantively inadequate. Instead, the Second Circuit found the IEP substantively inadequate because the "testimony and reports indicat[ed] that C.F.'s behavioral needs required a 1:1 placement[, whereas the IEP provided for a 6:1:1 ratio classroom]." Id. at 81.

### b.   Analysis

Here, Plaintiffs argue that the DOE "failed to give them . . . prior written notice [of C.C.'s summer placement], as required by law." (Pltf. Br. (Dkt. No. 30) at 12) The record is clear, however, that Plaintiffs received a Final Notice of Recommendation on June 10, 2011, that offered C.C. a placement at P811M at P101M "for the 2011-2012 school year." (Def. Ex. 3 (Dkt. No. 17)) The DOE thus complied with the regulatory requirement that it provide notice of the placement location within a "reasonable time" of the implementation date of the new IEP. See 34 C.F.R. § 300.503.

42

After the March 2, 2011 CSE meeting, C.C.'s mother signed a "Notice of

Recommended Deferred Placement" in which she agreed to "defer placement in [the] program

[recommended for C.C. in the March 2011 IEP] until June 15th, 2011." (Def. Ex. 5 (Dkt. No.

17) at 1)  The DOE complied with this deadline, sending Plaintiffs the Final Notice of

Recommendation – identifying C.C.'s placement for the 2011-12 school year – on June 10, 2011.

(Def. Ex. 3 (Dkt. No. 17))

Plaintiffs argue that, although they received a Final Notice of Recommendation

regarding C.C.'s placement for the 2011-12 school year, they "should have received two FNR

letters about placement – one for his summer placement and one for the September [2011] [to]

June [2012] placement." (Pltf. Br. (Dkt. No. 30) at 12 (citing Tr. 484))  They contend that the

DOE's failure to inform Plaintiffs that P101M would be located at a different site in July and

August constitutes a violation of the IDEA. (Id.)

The Second Circuit made clear in C.F., however, that issues of this sort do not

constitute procedural violations of the IDEA.  As discussed above, in C.F. the school listed in the

final notice of recommendation sent to C.F.'s father was not open in July.  The father's calls and

letters to the school thus went unanswered, and as a result C.F.'s father enrolled C.F. in a private

school.  C.F., 746 F.3d at 73-75.  While the court "acknowledge[d] the difficulties that [C.F.'s

father] had in communicating with the school site, these difficulties did not change the type of

placement and therefore did not violate the procedures of the IDEA."  Id. at 79.

Here, as in C.F., the DOE "complied with the IDEA by including [C.C.'s] parents

in the determination of the type of placement, the 6:1:1 placement at a [DOE] school."  Id.

(emphasis in original); see also Def. Ex. 8 (Dkt. No. 17) at 1-2 (minutes of March 2, 2011 CSE

meeting, indicating that C.C.'s mother was present and that the group discussed a number of her

43

concerns about C.C.'s peer grouping); Tr. 204-07 (Fochetta testimony that the CSE discussed the

appropriate peer grouping for C.C. with C.C.'s mother, and noted her concerns).  Likewise,

whatever difficulties C.C.'s mother experienced in learning of the relocated summer site for

P811M at P101M "did not change the type of placement and therefore did not violate the

procedures of the IDEA."[14]  C.F., 746 F.3d at 79.

DOE's alleged failure to notify Plaintiffs of P811M at P101M's relocated summer

site does not constitute a procedural violation of the IDEA.[15]

## B.    DOE's Compliance with the Substantive Requirements of the IDEA

Plaintiffs argue that the March 2011 IEP for C.C. substantively violated the IDEA

because the class C.C. was assigned to at P811M consisted of "unduly lower functioning

---

[14]  To the extent that Plaintiffs contend that they have a right under the IDEA to visit P811M at P101M in situs at its summer location, courts have rejected this argument.  See T.G. ex rel v. N.Y.C. Dep't of Educ., 973 F. Supp. 2d 320, 335 n.14 (S.D.N.Y. 2013) (emphasis in original) (citing S.F. v. N.Y.C. Dep't of Educ., No. 11 Civ. 870 (DLC), 2011 WL 5419847, at *13 (S.D.N.Y. Nov. 9, 2011) ("[The parents'] inability to visit the classroom to form an opinion as to its appropriateness is not itself a procedural defect"); E.A.M. v. N.Y.C. Dep't of Educ., No. 11 Civ. 3730 (LAP), 2012 WL 4571794, at *11 (S.D.N.Y. Sept. 29, 2012) (citation omitted) (internal quotation marks omitted) ("[A] school district has no obligation to . . . allow a parent to visit a proposed school or classroom before the recommendation is finalized or prior to the school year."); B.P. v. N.Y.C. Dep't of Educ., 841 F. Supp. 2d 605, 614 (E.D.N.Y. 2012) (quoting Cerra, 427 F.3d at 194) ("[S]chool districts must only ensure that a child's IEP is in effect by the beginning of the school year and that the parents are provided a copy. . . . [The DOE] fulfilled its legal obligations by providing the IEP before the first day of school."); Hanson v. Smith, 212 F. Supp. 2d 474, 487 (D. Md. 2002) ("There is no language in the IDEA requiring a school board to allow parents to visit the school of the proposed placement.").

[15]  Plaintiffs argue that the cumulative effect of the alleged procedural violations amounts to the denial of a FAPE.  "Even if no singular procedural violation in an IEP considered alone denies the student a FAPE, such violations may result in the denial of a FAPE when considered cumulatively."  M.L., 2014 WL 1301957, at *10 (citing R.E., 694 F.3d at 190).  However, where a court "conclude[s] that only one of the . . . alleged violations was in fact a procedural violation," then "[t]hat violation . . . can have no cumulative effect."  Id. (citing R.B., 2013 WL 5438605, at *12); cf. R.E., 694 F.3d at 192-96 (analyzing the cumulative effect of the determined, rather than alleged, procedural violations in three IDEA cases).  Here, this Court has found only one actionable procedural violation – failure to provide parental counseling and training in the IEP – and has concluded that this violation did not deny a FAPE to C.C.

44

students." (Pltf. Br. (Dkt. No. 30) at 6-11) Plaintiffs claim that this placement violated the CSE's finding that C.C. "should be placed with students of similar functioning levels." (Id. at 8) Plaintiffs further contend that the DOE's alleged failure to notify them of P811M at P101M's relocated summer site constitutes a substantive violation of the IDEA. (Pltf. Br. (Dkt. No. 30) at 11-14; Pltf. Reply Br. (Dkt. No. 33) at 3-6)

## 1. Substantive Adequacy of the March 2011 IEP

### a. Applicable Law

Although "a school district is not required to designate a specific school in an IEP[,] . . . school districts are not permitted to assign a child to a school that cannot satisfy the IEP's requirements." N.S., 2014 WL 2722967, at *12 (citing T.Y., 584 F.3d at 420). If the assigned school cannot meet the requirements of the IEP, then "the Department has by definition failed to deliver a FAPE." D.C. ex rel. E.B. v. N.Y.C. Dep't of Educ., 950 F. Supp. 2d 494, 509 (S.D.N.Y. 2013) (finding that the DOE denied a FAPE to a student where the IEP promised a "seafood free environment" but the cafeteria at his assigned school was not seafood-free).

The Second Circuit has instructed, however, that "neither party may rely on retrospective evidence to establish a placement's ability or inability to provide services required by an IEP." N.S., 2014 WL 2722967, at *14 (citing R.E., 694 F.3d at 186). "In the absence of evidence available to the parents at the time of the decision not to enroll their child in the placement, '"the appropriate inquiry is into the nature of the program actually offered in the written plan," not a retrospective assessment of how that plan would have been executed.'" Id. (quoting K.L., 530 F. App'x at 87 (2d Cir. 2013) (quoting R.E., 694 F.3d at 187)). Accordingly, "[p]ursuant to Second Circuit precedent, 'courts are prohibited from evaluating the adequacy of an unimplemented IEP based on evidence about the particular classroom in which a student

45

would be placed.'" R.B., 2013 WL 5438605, at *17 (citation omitted) (refusing to address plaintiffs' "object[ion] [about] the functional grouping of students in the specific class proposed by the DOE" because courts cannot evaluate the adequacy of an IEP based on retrospective evidence).

### b. Analysis

Here, Plaintiffs challenge the DOE's proposed placement on the ground that C.C. would have been educated with "extremely low functioning . . . classmates[]" in violation of the IEP's requirements. (Pltf. Br. (Dkt. No. 30) at 8-9) In support of their argument, Plaintiffs cite the DOE's profile for the class to which C.C. was assigned. Plaintiffs contend that the other five students in the class were "unduly 'low functioning'" and that "[o]nly one student was . . . near C.C. in academic functioning." (Id. at 7 (emphasis in original))

The IHO relied on the DOE's class profile in concluding that the proposed placement was inappropriate and deprived C.C. of a FAPE. The IHO found that (1) the P101M class profile "actually contained . . . 4 low functioning students out of the 5 children in the class" (IHO Decision (Dkt. No. 21) at 23); (2) the "4 low functioning children were non-readers and non-writers, and 3 of the 4 were rated as non-testable" (id.); (3) "[o]nly 1 of the 5 children ranked close to [C.C.'s] second grade level in reading and math" (id.); and (4) testimony from Bonnie Segal – the teacher who testified "about the relatively high functioning levels of the children" assigned to C.C.'s class – was "simply not credible in . . . light of the DOE's own data on the class profile." (Id. at 23-24) The IHO therefore concluded that the proposed placement was inappropriate and deprived C.C. of a FAPE.

In reversing the IHO's decision, the SRO noted that "it is undisputed . . . that the parents rejected the IEP and enrolled [C.C.] at the Forum School for the 2011-12 school year."

46

(SRO Decision (Dkt. No. 21) at 28)  The SRO found that Plaintiffs' rejection of the IEP was reflected in "their disagreement with the program recommendation" on the March 2, 2011 Notice of Recommended Deferred Placement (id. at 28 n.25 (citing Tr. 903-04; Def. Ex. 5 (Dkt. No. 17))), and in the "formal[] reject[ion] [of] the recommended program [set forth in their] letter dated June 16, 2011." (Id. (citing Def. Ex. J (Dkt. No. 17) at 1))  Under these circumstances, the SRO found that "the sufficiency of the [DOE]'s offered program must be determined on the basis of the IEP itself": "while the [DOE] [is] required to establish that the IEP [itself] was appropriate . . . , the [DOE] [is] not required to establish that the IEP was actually implemented in accordance with State and Federal law in the proposed classroom[]." (Id. at 28-29 (footnotes omitted))  The SRO declined to address the IHO's finding regarding improper grouping in the proposed classroom, because the IHO's review was limited to the adequacy of the IEP itself. (Id. at 29 n.27)

This Court concludes that the SRO's factual findings concerning the adequacy of the IEP are well-supported by the record, and that the SRO's analysis of the law follows the applicable precedent in this Circuit. As discussed above, C.C.'s mother first rejected the March 2011 IEP's 6:1:1 program in the Notice of Recommended Deferred Placement, which she signed either in March or May of 2011.[16]  (Def. Ex. 5 (Dkt. No. 17))  In a June 16, 2011 letter, Plaintiffs confirmed their rejection of the IEP. (Pltf. Ex. J (Dkt. No. 17) at 1)  Plaintiffs had no information during the March through June 2011 period about the abilities of the students who would be assigned to C.C.'s class at P811M, however. See Def. R. 56.1 Stmt. (Dkt. No. 37) ¶ 26

---

[16]  As discussed above, the handwritten date accompanying C.C.'s mother's signature is not entirely legible, but reflects a date in either March or May 2011. See Def. Ex. 5 (Dkt. No. 17).

("The DOE first provide[d] the Class Profile (Ex. LL) to Plaintiffs as a response to a subpoena procured during the IHO hearing.") (citing Tr. 31, 156).

Where, as here, parents have rejected an IEP and enrolled their child in private school, "courts are prohibited from evaluating the adequacy of an unimplemented IEP based on evidence about the particular classroom in which a student would [have been] placed." See R.B., 2013 WL 5438605, at *17 (citations omitted) (internal quotation marks omitted). Accordingly, this Court cannot consider evidence regarding the peer grouping of the students assigned to C.C.'s class at P811M.[17] To the contrary, this Court is "limited to discussing the placement and services specified in the written plan and therefore reasonably known to the parties at the time of the placement decision."[18] R.E., 694 F.3d at 187.

As to the substantive adequacy of the March 2011 IEP, the IHO concluded that it did not constitute "a suitable program calculated to confer a reasonable education[al] benefit and

_____

[17] B.R. ex rel. K.O. v. N.Y.C. Dep't of Educ., 910 F. Supp. 2d 670 (S.D.N.Y. 2012), cited by Plaintiffs, is not to the contrary. In B.R., the student's IEP provided that 1:1 occupational therapy would be provided at the student's placement site. Id. at 676. Before the student's mother rejected the IEP, however, she visited the school and "the occupational therapist then on staff informed her that occupational therapy at the school was provided in a group of six students . . . ." Id. The court found that, in evaluating whether the DOE properly implemented the student's IEP, the proper inquiry is "whether, at the time [the parent] was actually considering the proposed placement, the school could offer occupational therapy in line with the IEP." Id. at 677 (emphasis added). The court found that "the proposed placement as shown to [the parent] [before she rejected the IEP] was substantively inappropriate under the IDEA and constituted a denial of a free appropriate public education." Id. at 679. Here, by contrast, Plaintiffs rejected the March 2011 IEP well before learning about the students assigned to C.C.'s class. Accordingly, B.R. provides no support for Plaintiffs' argument.

[18] Plaintiffs argue that the ban on retrospective evidence should not apply to evidence about the functional grouping in a proposed classroom. (Pltf. Reply Br. (Dkt. No. 33) at 2-3) This Court is not persuaded. As discussed above, several courts in this Circuit have found that courts cannot evaluate "the adequacy of an unimplemented IEP based on evidence about the particular classroom in which a student would be placed," because such evidence is retrospective. R.B., 2013 WL 5438605, at *17; see also N.S., 2014 WL 2722967, at *14; A.M. ex rel. Y.N. v. N.Y.C. Dep't of Educ., 964 F. Supp. 2d 270, 286 (S.D.N.Y. 2013).

48

thus failed to provide [a] FAPE to [C.C.]." (IHO Decision (Dkt. No. 21) at 26) The IHO's conclusion is based on his findings about the actual makeup of the class in which C.C. would have been placed, however. (Id. at 23-25) As discussed above, this Court cannot consider the retrospective evidence on which the IHO relies. The SRO – who evaluated the adequacy of the program set forth in the IEP – concluded that "the March 2011 CSE's recommendation of a 12-month school year in a [6:1:1] special class in a specialized school with related services was appropriately designed to address [C.C.'s] special education needs, as identified in the evaluative information available to the CSE." (SRO Decision (Dkt. No. 21) at 18)

The record supports the SRO's conclusion that the 6:1:1 special class and related services "actually offered in the written [IEP]" provide C.C. with a FAPE. See N.S., 2014 WL 2722967, at *14. The record demonstrates that – at the CSE meeting – C.C.'s mother opined that a 6:1:1 program would be too restrictive for C.C. (Tr. 805-07), and that the CSE considered her concerns and whether C.C.'s educational needs could be met in a 12:1:1 or 8:1:1 ratio classroom. (Tr. 206-07) The CSE ultimately concluded that C.C. required a 6:1:1 placement. (Tr. 205; Def. Ex. 7 (Dkt. No. 17) at 1) As explained by Fochetta, the school psychologist who had helped formulate C.C.'s IEPs in 2008 and 2009, the CSE

> ruled out both [the 8:1:1 and 12:1:1 options] as too large, too large a student/teacher ratio, to meet [C.C.'s] needs . . . . [W]e [also] talked more about the ratio and the degree of support that [C.C.] needed. And we knew the ratio he was in at Rebecca School . . . and their ratio . . . , very broadly speaking, was two-to-one, meaning two students [for] every adult.

(Tr. 205, 207) The CSE concluded that C.C. required a "very small[,] . . . very supportive [classroom]." (Tr. 208)

The March 2011 IEP reflects these considerations and the CSE's conclusion that C.C.'s educational needs could best be addressed in a 6:1:1 ratio classroom. See Def. Ex. 7 (Dkt.

No. 17) at 15 ("[a] special class in a specialized school with both student to teacher ratios of 12:1:1 and 8:1:1 [was] considered and rejected as insufficiently supportive"; "[t]he student to teacher ratios in these programs are too large for [C.C.] to be able to achieve his IEP goals").

The IEP reflects a careful analysis of C.C.'s skills and challenges, and includes strategies to ensure that he receives the individualized attention necessary for him to make progress. C.C.'s academic performance and learning characteristics are discussed in detail, including the fact that he tested in the second-grade range in reading comprehension and writing, and close to the second-grade range in computation. (Def. Ex. 7 (Dkt. No. 5) at 3) The IEP states that C.C. benefits from "redirection to task; repetition; visual and verbal cues; sensory breaks; [and] verbal praise." (Id.) The IEP also lists C.C.'s social and emotional characteristics, and identifies several strategies to deal with his needs, including that he "benefits from adult support in providing strategies to increase alertness" and "from co-regulation through modeling a calm state (deep breathing and using a calm voice)." (Id. at 4) With respect to C.C.'s health and physical needs, the IEP notes that his "diet needs to be closely monitored," and that "[o]ccupational and [p]hysical therapy continue to be warranted." (Id. at 5)

The IEP also lists 14 annual goals and 39 short-term objectives for C.C. to accomplish during the 2011-12 school year. The goals and objectives address, inter alia, C.C.'s skills in reading, math, writing, speech, language, and physical fitness, as well as his needs for occupational therapy and counseling. (Id. at 6-13) A number of the goals included in the IEP are based on C.C.'s mother's suggestions at the CSE meeting. (Tr. 200-03 ("Essentially we asked the parent, 'Is there anything else you'd like to add?' . . . . We discussed them at the meeting, they were written at the meeting by myself, typed in after at the suggestion of the

50

parents, but I want to be clear that I thought their suggestion[s] [were] perfectly reasonable. And I included them.")

       This Court concludes that the March 2011 IEP was "reasonably calculated to enable [C.C.] to receive educational benefit[s]," R.E., 694 F.3d at 190 (citations omitted) (internal quotation marks omitted), and that it "affords [C.C.] . . . an opportunity greater than mere trial advancement." R.B., 2013 WL 5438605, at *12 (citations omitted) (internal quotation marks omitted). Keeping in mind that the IDEA "does not require states to 'maximize the potential of handicapped children,' . . . [but rather to] provide such children with 'meaningful access' to education," Frank G., 459 F.3d at 364 (quoting Rowley, 458 U.S. at 213; Walczak, 142 F.3d at 133), this Court finds that the record supports the SRO's finding that the March 2011 IEP is substantively adequate.

### 2.    Failure to Provide Written Notice of P811M at P101M's Relocated Summer Site

       Although this Court has concluded that the DOE's failure to provide written notice to Plaintiffs of P101M's relocated summer site does not constitute a procedural violation of the IDEA, it must go on to consider whether DOE's conduct constitutes a substantive violation. As discussed above, in C.F. the Second Circuit left open the possibility that DOE's "failure to specify a school site may render an IEP substantively inadequate." C.F., 746 F.3d at 79. While the Second Circuit does not explain the circumstances in which a failure to specify a school site will render an IEP substantively inadequate, it is obvious that if no school is ever made available to a disabled student, there is no hope that the goals and objectives set forth in that student's IEP will be realized. This is not that case, however.

       The DOE notified Plaintiffs of C.C.'s placement for the 2011-12 school year on June 10, 2011. The placement was "P811M [at] P101M." (Pltf. Ex. I (Dkt. No. 17)) The IHO

found, and it is undisputed, that P811M at P101M was open at that time and could have been visited by Plaintiffs at any time from June 10, 2011, through the end of that month. (IHO Decision (Dkt. No. 21) at 24; Tr. 306)

Plaintiffs also do not dispute that C.C.'s mother spoke with Michael Santos, the Transportation Coordinator at P101M, in mid-June after she received the DOE's placement letter. (Tr. 813-14; Pltf. Ex. J (Dkt. No. 17) at 1)   Santos testified that he recalled speaking with parents in June 2011 who were inquiring about P811M at P101M's summer school, but did not recall speaking with C.C.'s parents.   Santos testified that he told the parents who called that P101M would be closed in July and August because of construction, but that children in P811M's summer program would be assigned to either P811M's main site or to P149. (Tr. 301-02, 306-07)   C.C.'s mother testified that she spoke with Santos, and he said that it was "not possible" for her to look at the school because it was "closed for the summer." (Tr. 813-14)

The IHO rejected Santos's testimony because "he [had] made no record of those who called him, and he had no idea if he ever spoke to [C.C.'s] parents." (IHO Decision (Dkt. No. 21) at 24)   It was not reasonable for the IHO to reject Santos's testimony on this basis, however, because Plaintiffs do not dispute that Santos and C.C.'s mother spoke. (Tr. 813-14; Pltf. Ex. J (Dkt. No. 17) at 1)   The relevant issue is not whether they spoke, but what Santos said. On that score, it appears highly unlikely that Santos would have told C.C.'s mother that (1) P811M at P101M was then closed, given that it concededly was not; and (2) there was no summer school for children assigned to P811M at P101M, when Santos was aware that P101M's summer school would proceed at P811M's main site and at P149.   While the DOE should have responded to C.C.'s mother's June 16, 2011 letter asserting that P811M at P101M was closed for the summer and that no summer program would be offered (Pltf. Ex. J (Dkt. No. 17) at 1),

52

DOE's failure to respond does not change the fact that the DOE assigned a placement to C.C. which was then in operation. It also seems clear that a visit to P811M at P101M in June would have immediately clarified any confusion. Under these circumstances, this Court concludes that the failure to provide Plaintiffs with written notice of the P811M summer site location does not constitute a substantive violation of the IDEA that requires this Court to conclude that C.C. was deprived of a FAPE.

This Court also notes that it appears clear from the record that Plaintiffs' rejection of the IEP flowed from their conviction that the IEP did not properly address their son's educational needs, and not from confusion about whether P811M would offer summer school. C.C.'s mother made clear at the CSE meeting that Plaintiffs "were looking for a less restrictive placement, [a] similar class size to what he was doing well in [at the Rebecca School, i.e., an 8:1:3 class], and stronger peer[s]." (Tr. 805) C.C.'s mother believed that the 6:1:1 program favored by the CSE was a "less challenging environment" that was not appropriate for C.C. Indeed, C.C.'s mother testified that she had never seen a 6:1:1 program that was "the kind of more challenging placement that [she] was envisioning for [C.C.]." (Tr. 806-07)

C.C.'s mother first communicated her rejection of the IEP in the weeks after the CSE meeting. On the "Notice of Recommended Deferred Placement" she signed and returned to the DOE, C.C.'s mother checked a box stating, "I disagree with the Program Recommendation." (Def. Ex. 5 (Dkt. No. 17) (emphasis in original); see also Tr. 903-04 (testimony of C.C.'s mother indicating that she communicated to DOE her disagreement with the IEP "prior to receiving the final notice of recommendation"))

C.C.'s mother confirmed her rejection of the IEP in her June 16, 2011 letter to the chairman of the CSE. C.C.'s mother states that Plaintiffs "are concerned that [C.C.] was not

properly evaluated and assessed in preparation for the IEP development and, for a number of reasons, the program recommended and [the] proposed IEP are not appropriate for [C.C.]." (Pltf. Ex. J (Dkt. No. 17) at 1)  C.C.'s mother notes that C.C. "continues to require more intensive and specialized teaching support, as well as extended day services, to address his unique deficits.  In addition, although we requested special education transportation it was not given to us on the IEP." (Id.)  She warns that, "[u]nless the DOE offers [C.C.] an appropriate placement and program, please be advised that [C.C.] will attend[] The Forum School . . . for the 2011-2012 twelve[-]month school year . . . ." (Id.)

This Court concludes that the lack of written notice concerning P811M at P101M's relocated summer school "had no bearing on the parents' decision to reject the [IEP]. Instead, they rejected the placement because it did not comport with their methodological preferences." See A.S., No. 10 Civ. 9 (ARR) (RML), at *19, (citing P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 738 (3d Cir. 2009) ("While the delay in evaluating [the student] was unfortunate, the record does not show that the delay had any impact in the plaintiffs' decision to keep [the student] [in his current private school] for the 2004-2005 school year.")), aff'd, 573 F. App'x 63 (2d Cir. 2014).

\*          \*          \*          \*

This Court concludes that the March 2011 IEP was procedurally and substantively adequate, and that the DOE offered C.C. a FAPE for the 2011-12 school year.



## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is granted, and Plaintiffs' motion for summary judgment is denied. The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 29, 35) and to close this case.

Dated: New York, New York
      March 31, 2015

SO ORDERED.

Paul G. Gardephe
United States District Judge